IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NICOLE MERCER,              )
                            )
        Plaintiff,          )
                            )       No. 3:22-cv-337
v.                          )       JUDGE RICHARDSON
                            )
UNUM LIFE INSURANCE COMPANY )
OF AMERICA and UNUM GROUP   )
CORPORATION,                )
                            )
        Defendants.         )

**<u>MEMORANDUM OPINION</u>**

Pending before the Court are cross-motions for judgment on the administrative record filed respectively by Defendants Unum Life Insurance Company of America and Unum Group Corporation on the one hand and Plaintiff Nicole Mercer on the other. (Doc. Nos. 47, 50). Each motion was supported by an accompanying memorandum of law. (Doc. Nos. 48, 51).[1] Defendants and Plaintiff filed respective responses (Doc. Nos. 55, 56) to the other's motion and filed replies (Doc. Nos. 57, 58) to those respective responses.

Plaintiff seeks judicial review and reversal of Defendants' decision to deny her claim for long-term disability benefits under an employer-provided disability plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002 et seq. (*See* Doc. No. 1).

---

[1] Plaintiff filed an amended memorandum (Doc. No. 65), replacing her original memorandum (Doc. No. 51). A review of Plaintiff's memoranda reveals two substantive changes. The amended memorandum includes unredacted deposition testimony that was redacted in the original memorandum, and a footnote explaining the reason for the original redaction has been deleted. (Doc. No. 51 at 26; Doc. No. 65 at 26). Because there are no other differences between the two memoranda, the Court will cite to the amended memorandum in its discussion of Plaintiff's arguments. The Court further directs Plaintiff to Local Rule 7.01(a)(2), which requires that "[n]o memorandum shall exceed twenty-five (25) pages without leave of Court." Neither the original memorandum nor the amended memorandum complies with the Local Rules as each is forty-four (44) pages long. Counsel is admonished to adhere to the Local Rules in all future filings.

The Complaint sets forth one count, asserting a claim for an award of benefits under ERISA. (*Id.* at 8); *see also* 29 U.S.C. § 1132(a)(1)(B). For the reasons stated below, Plaintiff's Motion will be DENIED, and Defendants' Motion will be GRANTED.

## BACKGROUND[2]

Beginning in 2017, Plaintiff worked as a nurse practitioner and instructor at Vanderbilt University Medical Center, which provided insurance for employees through Unum. (Doc. No. 26 at 4; Doc. No. 26-4 at 118). Part of her insurance coverage included a long-term disability plan ("the Plan"). (Doc. No. 26). The Plan provided as follows concerning the definition of "disability":

HOW DOES UNUM DEFINE DISABILITY?

> You are disabled when Unum determines that:
>
> [Y]ou are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(*Id.* at 17).[3] In order to receive benefits under the Plan, an insured "must be continuously disabled through [their] elimination period." (*Id.*) The "elimination period" lasts 180 days from the first day of disability. (*Id.* at 17, 32). An insured may still work during the elimination period, but she must be continuously disabled during that time. (*Id.* at 17). The Plan further indicated that Defendants possessed "discretionary authority to make benefit determinations under the Plan," but that "[a]ll benefit determinations must be reasonable and based on the terms of the Plan and the facts and

---

[2] The facts herein are taken from the administrative record. (Doc. Nos. 26–26-16). By the Court's calculation, the administrative record contains 3,448 pages of documents, records, and information, although many of the documents therein are duplicative of one another. The Court has thoroughly reviewed this record.

[3] The Court notes that what the Plan does here is provide a definition for "[having a] disability" and also equate "[having a] disability" with "[being] disabled." Because the Plan equates these two concepts and uses them interchangeably without drawing a distinction, the Court does likewise, although it believes it preferable to refer to someone as a person who has a disability rather than as a person who is disabled.

circumstances of each claim." (*Id.* at 43). The making of a benefit determination includes "determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan." (*Id.*)

Plaintiff's elimination period began on September 25, 2020. On that day, she reduced her working hours, citing a disability caused by fibromyalgia, chronic fatigue syndrome, postural orthostatic tachycardia syndrome, and autonomic dysfunction. (Doc. No. 26-1 at 34–38). Before her elimination period ended 180 days later on March 23, 2021, she filed with Defendants a claim for disability benefits on January 31, 2021. (*Id.*). Defendants thereafter contacted Plaintiff to begin reviewing her claim. (*Id.* at 119–24). During conversations with Defendants' claims investigators, Plaintiff detailed the extent of her conditions and provided the contact information for several medical providers, including her treating nurse practitioner, Kathryn Hansen. (*Id.*). Plaintiff confirmed that of all of her medical providers, only Hansen recommended that Plaintiff be placed under work restrictions and limitations given her medical conditions. (*Id.* at 120).

With this basic information, Defendants began an investigation to determine whether Plaintiff met the Plan's definition of being disabled. They obtained Plaintiff's medical records (Doc. No. 26-1 at 154–250; Doc. No. 26-2 at 1–24, 40–82, 86–99, 115–72), researched her work responsibilities (Doc. No. 26-1 at 126–31), exchanged emails with Plaintiff's employer regarding her reduced workload (*Id.* at 141–42, 173–76), contacted pharmacies where Plaintiff received medication (*Id.* at 143–48), provided Plaintiff with a questionnaire regarding her work experience and education (Doc. No. 26-2 at 100–05), and maintained communication with Plaintiff who provided updates regarding her physical health (*Id.* at 25, 34–38). Defendants did not, however, conduct an independent physical examination of Plaintiff. Defendants also completed an internal review of Plaintiff's job duties and functions, determining that Plaintiff's "regular occupation" met

the definition of "Nurse Practitioner." (*Id.* at 108) Such a position, Defendants concluded, entailed what qualified as "light work." (*Id.*) The "material and substantial duties" of such light work involved frequent sitting, occasional standing and walking, and solving problems and supervise others, among other tasks. (*Id.*) Defendants then conducted an analysis of the information that they had obtained during their investigation, tasking three medical professionals with making their own independent determination as to the extent and effect of Plaintiff's alleged disability. (*Id.* at 108–09).

Patricia Edwards, a registered nurse, reviewed Plaintiff's claim file and medical records and concluded that Plaintiff's medical conditions did not prevent her from performing the "material duties" associated with her position as a nurse practitioner. (*Id.* at 237–42). Dr. Sabrina Hammond, an internal medicine physician, also reviewed Plaintiff's claim. (*Id.* at 250; Doc. No. 26-4 at 1–9). She spoke with Hansen, the nurse practitioner who had recommended that Plaintiff reduce her working hours and limit strenuous activity. (Doc. No. 26-4 at 2). Hansen reported that Plaintiff had cut back significantly on exercise but still maintained some regular physical activity. (*Id.*) She further stated that Plaintiff's medical conditions prevented her from returning to full-time work. (*Id.*) Based on this background, Dr. Hammond then conducted a review of Plaintiff's medical records. Dr. Hammond noted that Plaintiff self-reported maintaining a somewhat rigorous exercise regimen during the elimination period, including cycling, using a treadmill, and strength training. (*Id.* at 8). She further highlighted Plaintiff's own reports of improvement (*Id.* at 7) and cited information from the medical records that indicated that Plaintiff's symptoms were "stable" and "well controlled." (*Id.* at 6–8; Doc. No. 26-3 at 158, 188). Ultimately, Dr. Hammond concluded that Plaintiff did not suffer from a disability severe enough to warrant the 50% reduction in work that Hansen had recommended, or indeed any reduction in work. (Doc. No. 26-4 at 5). Dr.

Arlen Green next reviewed Plaintiff's claim. (*Id.* at 31–33). His report reiterated the findings contained in Plaintiff's medical records, including her diagnoses as well as general findings that Plaintiff was "stable without any neurological deficits." (*Id.* at 32). Dr. Green accordingly concluded that Plaintiff's medical records did not support any restrictions on her ability to engage in the material and substantial duties associated with her role as a nurse practitioner during the elimination period. (*Id.*)

Defendants thus ended their months-long investigation and denied Plaintiff's claim via a letter to her dated April 14, 2021. (*Id.* at 64–71). The denial letter reviewed the steps of the investigation and detailed the medical records that supported the denial, highlighting Dr. Hammond's and Dr. Green's findings. (*Id.*). On May 30, 2021, Plaintiff ceased working entirely. (Doc. No. 26-13 at 151). And in October 2021, she retained counsel to appeal Defendants' denial of her claim, submitting additional records in support of her appeal. (Doc. No. 26-12 at 62, 74).

Among the additional documentation were records and letters from some of Plaintiff's treating medical providers, including Hansen, Dr. Tracy Jackson (one of Plaintiff's treating physicians) and Dr. Thomas Whitfield (Plaintiff's primary care physician). Dr. Whitfield's records indicated that Plaintiff reported chronic fatigue and pain for years. (Doc. No. 26-13 at 85–118). And according to his completed "medical opinion form," Dr. Whitfield opined that Plaintiff's conditions required that she rest for 45 minutes for every 15 minutes of work and be absent from work for at least 25 days each month. (*Id.* at 121–22). Hansen shared similar findings in her letter and opinion form, asserting that medications and treatment were only somewhat helpful, and that Plaintiff could not "work a full or even a half day without" debilitating fatigue. (*Id.* at 141–46). Dr. Jackson likewise opined that Plaintiff experienced significant malaise and fatigue, needing

several days of rest to recover from a half-day of work. (*Id.* at 161). She concluded that Plaintiff's disease was unlikely to improve and asserted that Plaintiff was medically disabled. (*Id.* at 162.)

In addition to the records of her treating providers, Plaintiff also submitted letters from personal acquaintances and the findings of Wallace Stanfill, a vocational consultant and rehabilitation counselor. Stanfill reviewed Plaintiff's medical and employment records. (*Id.* at 148). He concluded that Plaintiff had been "totally disabled" from performing the tasks associated with her job as a nurse practitioner since May 30, 2021—the date on which Plaintiff ceased working and, notably, a date more than two months after the end of her elimination period. (*Id.* at 153). Plaintiff also submitted a letter from her ex-wife, who described witnessing Plaintiff's significant atrophy and decline in ability to work and live a normal life. (*Id.* at 155–57). Plaintiff's current partner recounted much of the same in a separate letter. (*Id.* at 159).

Defendants reviewed the additional information that Plaintiff submitted. G. Shannon O'Kelley, Defendant's own vocational consultant, completed an independent occupational analysis of Plaintiff's claim. (Doc. No. 26-14 at 170–72). He reviewed Stanfill's findings and reaffirmed that Plaintiff's occupation aligned most closely with the Department of Labor's definition of "Nurse Practitioner." (*Id.*). Such a role, O'Kelley concluded, qualified as involving "light work," involving frequent sitting, occasional standing and walking, and other tasks. (*Id.*). Amanda Abbott, a registered nurse, then reviewed Plaintiff's claim. (*Id.* at 173–78). Abbott noted that Plaintiff's medical records showed "essentially normal" testing for postural orthostatic tachycardia syndrome, improved orthostatic symptoms with Plaintiff's then-current rest regimen, and improved tachycardia symptoms after Plaintiff began taking medication. (*Id.* at 178). Based on these findings, Abbott concluded that Plaintiff would not be precluded from performing the

tasks associated with her position as a nurse practitioner. (*Id.*). Nevertheless, Abbott recommended that a physician review the records as well. (*Id.*).

Dr. Chris Bartlett, a physician employed by Defendants, thereafter reviewed Plaintiff's claim. (*Id.* at 186–192). He determined that Plaintiff's medical conditions did not prevent her from working as a nurse practitioner during the elimination period. (*Id.* at 188). Dr. Bartlett supported his conclusion by noting that Plaintiff had worked part-time during the elimination period, expressed periodic improvements, experienced an abatement in symptoms after taking medications, and received "normal" results from medical evaluations and tests. (*Id.* at 188–90). Still, Dr. Bartlett reached out to Dr. Whitfield to understand why he had recommended that Plaintiff reduce her workload. (*Id.* at 194, 198–200). Plaintiff's counsel protested, citing the revocation of prior authorizations for Defendants to contact Plaintiff's physicians. (*Id.* at 207–08). Defendants then ceased attempting to contact Dr. Whitfield, provided Plaintiff with copies of Dr. Bartlett's investigation files and letter to Dr. Whitfield, and gave Plaintiff a deadline of January 13, 2022, by which to respond to Dr. Bartlett's findings before closing the appeal process. (*Id.* at 250; Doc. No. 26-15 at 1–6). On the deadline, Plaintiff submitted letters from Hansen and Dr. Jackson as well as additional medical records. (Doc. No. 26-15 at 11–12).

The new medical records revealed that Plaintiff hired a caregiver to assist her with daily care (*Id.* at 33), continued to experience significant fatigue and renewed low-grade fevers (*Id.* at 40), and was admitted to the hospital as her symptoms worsened (*Id.* at 51). Dr. Jackson's letter simply acknowledged that she did not agree with Dr. Bartlett's assessment of Plaintiff's claim. (*Id.* at 56). Hansen's correspondence likewise disputed Dr. Bartlett's findings. (*Id.* at 68–71). Unlike Dr. Jackson, however, Hansen explained her contrary rationale. She asserted that Plaintiff's "fatigue is debilitating," and that although Plaintiff had shown "periods of improvement," these

periods "have not been sufficient for her to sustain full[-]time employment." (*Id.* at 70). Ultimately, Hansen concluded that based on her clinical judgment, Plaintiff was not able to sustain full-time employment despite her relative alertness in a clinical setting and her ability to maintain regular exercise. (*Id.* at 70–71). Plaintiff thereafter submitted additional medical records after the January 13, 2022, deadline. (*Id.* at 88–108, 136–79).

On February 3, 2022, Defendants upheld their denial of Plaintiff's claim and sent Plaintiff a letter detailing the basis of their decision. (Doc. No. 26-16 at 111–24). They noted that the new information that Plaintiff had submitted in January 2022 concerned Plaintiff's medical conditions after the expiration of the elimination period and was accordingly not "supportive of disability." (*Id.* at 117). Defendants further appended the relevant provisions of the Plan and explained that Plaintiff could bring suit under Section 502(a) of ERISA if she disagreed with the outcome of the appeals process. (*Id.* at 118–20).

On May 10, 2022, Plaintiff did just that by filing her complaint. (Doc. No. 1). Following a lengthy period of discovery and unsuccessful attempts to mediate the case, the parties filed the present cross-motions for judgment on the administrative record.

## LEGAL STANDARDS

Courts review the denial of benefits challenged under ERISA de novo, unless the "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a benefits plan grants such discretion, then the court "will review an administrator's benefits denial under an arbitrary-and-capricious standard." *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022). Because the plan in the present case (i.e., the Plan) afforded Defendants "discretionary authority to make benefit

determinations," the arbitrary-and-capricious standard applies here.[4] (Doc. No. 26 at 17); *see Harmon v. Unum Life Ins. Co. of Am.*, No. 1:20-CV-318-KAC-CHS, 2023 WL 4166085, at *10 (E.D. Tenn. June 23, 2023) (citing the same policy language to support application of the arbitrary-and-capricious standard), *aff'd*, No. 23-5619, 2024 WL 1075068 (6th Cir. Mar. 12, 2024).

The arbitrary-and-capricious standard "is extremely deferential and has been described as the least demanding form of judicial review." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107–08 (7th Cir. 1998)). But the reviewing court may not "merely . . . rubber stamp the administrator's decision." *Jordan v. Reliance Standard Life Ins. Co.*, No. 22-5234, 2023 WL 5322417, at *6 (6th Cir. Aug. 18, 2023) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). Instead, it must "uphold an administrator's benefits decision as long as 'it is the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." *Autran*, 27 F.4th at 411 (omission in original) (quoting *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 547 (6th Cir. 2020)). This inquiry consists of two components, requiring the court to determine whether "substantively or procedurally, [the administrator] has abused his discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). The claimant[5] "bears the burden of proving

---

[4] The parties appear to agree that the Court should apply the arbitrary-and-capricious standard in review of the administrator's denial of Plaintiff's claim. Defendants point to the language of the Plan cited above. (Doc. No. 48 at 12). Plaintiff's briefing is less straightforward, but she argues that Defendants acted arbitrarily and capriciously and never suggests that the Court should apply de novo review of the administrator's denial. (*See* Doc. No. 56 at 14–15; Doc. No. 65 at 15–17, 37).

[5] Herein, the Court uses the term "claimant" to refer, unsurprisingly, to an insured who has filed a claim and is going through the claims process.

that the [p]lan [a]dministrator's decision was arbitrary or capricious." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011).[6]

The substantive prong requires that plan administrators "reach only those conclusions that are supported by substantial evidence in the administrative record." *Autran*, 27 F.4th at 412. An administrator's decision is substantively reasonable "if a rational person could conclude that the evidence was 'adequate' to justify the decision." *Id.* (quoting *Davis*, 980 F.3d at 549). If there is record evidence that could support the award or denial of benefits, then "the administrator's choice between this conflicting evidence cannot be considered arbitrary on substantive grounds." *Id.* (collecting cases).

"Procedurally, plan administrators must engage in reasoned decision[-]making." *Id.* (citing *Davis*, 980 F.3d at 547). And to determine whether a plan administrator engaged in such reasoned decision-making, the court considers several factors. *Glenn*, 554 U.S. at 116–17. Which factors are relevant varies with each case. Some factors include whether "the administrator consider[ed] all the evidence or overlook[ed] evidence that cut the other way," *Autran*, 27 F.4th at 412 (citation omitted), whether "the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant," *Olah v. Unum Life Ins. Co.*, No. 1:19-CV-96-KAC-CHS, 2023 WL 7305033, at *5 (E.D. Tenn. Nov. 6, 2023) (quoting *Fura v. Fed. Express Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013)), *appeal*

---

[6] The standard of review is typically described as the "arbitrary *and* capricious standard." *See Firestone Tire & Rubber Co.*, 489 U.S. at 952 (emphasis added). And consistent with that description, courts typically state that in order to uphold a denial, a reviewing court must conclude that the plan administrator's decision was *neither* arbitrary *nor* capricious. *See, e.g.*, *Jordan*, 2023 WL 5322417, at *6 ("[W]e will reverse the administrator's decision only if it is arbitrary or capricious.") (citation and internal quotation marks omitted); *Duncan v. Minn. Life Ins. Co.*, 845 F. App'x 392, 402 (6th Cir. 2021) (upholding a denial of benefits that was "neither arbitrary nor capricious"); *McClain*, 740 F.3d at 1068 ("We cannot find Defendants' denial of benefits arbitrary or capricious . . . ."). However, the Court does not perceive that courts recognize any real analytical distinction between a denial that is "arbitrary" and a denial that is "capricious."

*dismissed*, No. 23-6067, 2024 WL 2852092 (6th Cir. Mar. 20, 2024), and whether (and if so to what extent) the administrator operated under a "conflict of interest." *Glenn*, 554 U.S. at 108. None "of the potentially relevant factors is dispositive in its own right," and the court "must weigh them all when deciding whether the administrator's ultimate conclusion resulted from a rational process." *Autran*, 27 F.4th at 412.

## DISCUSSION

Plaintiff argues that Defendants' claim denial should be reversed for three main reasons, each of which is discussed below. But the evidence on which Defendants relied was substantial, and their process was eminently reasonable and deliberative. Having reviewed the parties' briefing and the administrative records, Defendants' arguments are more persuasive and their decision to deny Plaintiff benefits was neither arbitrary nor capricious.

### I.    Substantial evidence

#### A.  Disability determination

As a substantive matter, the Court first must address whether Defendants "reasonably found that [Plaintiff] was not . . . disabled within the meaning of the Plan." *Autran*, 27 F.4th at 412. To do so, the Court "start[s] with basics about the Plan's key terms." *Id.* An insured is disabled for purposes of the Plan (if at all) as of the time (if ever) that, according to Defendants' subsequent determination, she is "limited from performing the material and substantial duties of [her] regular occupation due to your sickness or injury; and [she] ha[s] a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury." (Doc. No. 26 at 17). To receive benefits, the insured must meet this definition of disability throughout the duration of the elimination period. (*Id.*) The critical question, therefore, is whether Defendants' conclusion that Plaintiff was not disabled throughout the elimination period was a "rational decision" based on "adequate"

evidence. *Id.* (quoting *Davis*, 980 at 549); *see also McClain*, 740 F.3d at 1065 (quoting *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) ("When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.") The Court looks to the administrative record. *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 607 (6th Cir. 2016) ("[T]he court's review is limited to the administrative record.").

First, many of Plaintiff's medical exams and tests revealed normal results despite consistent self-reported pain. (Doc. No. 26-2 at 89–90; Doc. No. 26-4 at 5; Doc. No. 26-14 at 19–33). Additionally, providers' notes from medical appointments conducted during the elimination period indicate that Plaintiff's pain was "tolerable," "improved," and "so much better" at various times. (Doc. No. 26-1 at 168–70; Doc. No. 26-3 at 154). Other records contain information showing that her fibromyalgia was "stable" and that her postural orthostatic tachycardia syndrome was "well controlled" during the elimination period. (Doc. No. 26-3 at 158, 183). Additionally, Plaintiff was able to manage her pain and fatigue with treatment and medication during the elimination period. (Doc. No. 26-3 at 85–86; Doc. No. 26-7 at 159). And just before she reduced her working hours, Plaintiff reported to her cardiologist that she was able to ride her bike six miles three to five times a week and perform yoga regularly. (Doc. No. 26-2 at 67). At a follow-up medical appointment during the elimination period, she reported maintaining her cycling routine and using the treadmill. (Doc. No. 26-3 at 177). In fact, the provider at the follow-up appointment noted that despite Plaintiff's "persistent fatigue," "[a]lmost all of her orthostatic symptoms are vastly improved on her current regimen." (*Id.*) Furthermore, although Plaintiff's treatment providers consistently noted that she suffered from her conditions, only Hansen recommended that Plaintiff reduce her work hours during the elimination period. (Doc. No. 26-1 at 120; Doc. No. 26-3 at 66; Doc. No.

26-4 at 3). Finally, medical professionals employed by Defendants conducted several independent file reviews, and all of them concluded that Plaintiff's medical conditions and symptoms did not support restrictions on her work as a nurse practitioner. (Doc. No. 26-2 at 237–42; Doc. No. 26-4 at 5, 31–33; Doc. No. 26-14 at 178, 186–92).

Plaintiff counters by pointing to records that detail a litany of diagnoses and symptoms. (Doc. No. 56 at 5–14; Doc. No. 58 at 3–6; Doc. No. 65 at 40–43). And evidence in the record might support a finding that Plaintiff suffered from debilitating pain and malaise as a result of her medical conditions. But the Court's task is not to determine whether the administrator's "decision was the most reasonable decision, or whether it was more reasonable to deny benefits than to grant them; instead, under the arbitrary and capricious standard—the 'least demanding form of judicial review'—[the Court] ask[s] only whether it is *possible* to offer an explanation for the outcome." *Holden v. Unum Life Ins. Co. of Am.*, No. 20-6318, 2021 WL 2836624, at *11 (6th Cir. July 8, 2021) (quoting *Davis*, 887 F.3d at 693). Defendants have clearly articulated a rational explanation for the outcome. *See Carty v. Metro. Life Ins. Co.*, 224 F. Supp. 3d 606, 615 (M.D. Tenn. 2016) ("Under the [arbitrary-and-capricious] standard, the determination of an administrator will be upheld if it is 'rational in light of the plan's provisions.'" (quoting McClain, 740 F.3d at 1064)).

The Court now turns to Plaintiff's three objections that address the substantive prong of the inquiry. Although the Court has already found that there was substantial evidence in the record to support Defendants' denial of Plaintiff's claim, the Court endeavors to provide a thorough analysis of Plaintiff's arguments. *Cf. Holden*, 2021 WL 2836624, at *10–15 (first affirming the denial was rational and supported by substantial evidence and then addressing the plaintiff's objections to the adequacy of the evidence).

   B.  *Objective Evidence*

Defendants argue that a lack of "objective evidence" supporting Plaintiff's allegations of a disability was fatal to her claim. (Doc. No. 48 at 14–18). Plaintiff contends, however, that the Plan did not require submission of such evidence and that because Defendants failed to raise this issue in their denials, they have forfeited the argument. (Doc. No. 56 at 6–13).

Although "fibromyalgia can be a severe impairment," it is difficult to diagnose because those who suffer from the condition "present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). The same is true of chronic fatigue syndrome, *Buxton v. Halter*, 246 F.3d 762, 763 n.1 (6th Cir. 2001), and postural orthostatic tachycardia syndrome, *Outward v. Eaton Corp. Disability Plan for U.S. Employees*, 808 F. App'x 296, 304 (6th Cir. 2020) (noting that symptoms of the disorder "were not demonstrable through medical testing"). The Sixth Circuit has held, however, that although a requirement of "objective evidence of fibromyalgia itself" would be "burdensome" on claimants, claimants can furnish "objective evidence of [the] *disability* [that allegedly is] due to fibromyalgia." *Huffaker v. Metro. Life. Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008); *see also Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."). Indeed, "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007).

Importantly, as Plaintiff observes, the Plan, unlike other benefit policies, did not require the submission of objective evidence to prove a disability. *See Curry v. Eaton Corp.*, 400 F. App'x 51, 53 (6th Cir. 2010) (the benefit policy defined "objective findings of a disability" as those findings that "can be observed by your physician through objective means, not just from a

description of your symptoms.") Defendants rely on *Huffaker* and *Cooper* to argue that a plan administrator can require the submission of objective evidence even when the policy does not contain language explicitly so requiring. In *Huffaker*, the policy required proof that the claimant was "unable to perform each of the material duties" of her occupation. 271 F. App'x at 499. And in *Cooper*, the policy required proof that the claimant was "unable to perform all the material duties of" her position. 486 F.3d at 159. In both cases, the Sixth Circuit determined that although the policy did not clearly require the submission of explicit evidence, the plan administrator nevertheless could require explicit evidence based on the policy's language and the request for such evidence during the investigatory process. *Huffaker*, 271 F. App'x at 500; *Cooper*, F.3d at 166–67.

In the present case, however, Defendants never explicitly cited a lack of objective evidence as a reason that they were denying Plaintiff's claim. But their denial letters did thoroughly detail the reasons for the denials. According to the first denial letter, Plaintiff's evidence showed an improvement in symptoms, a moderately active lifestyle inconsistent with her reported symptoms, and normal test results. (Doc. No. 26-4 at 64–71). And Plaintiff was permitted to appeal the decision by submitting additional information supportive of her claim that she was disabled as defined by the plan. (*Id.* at 70). The second denial letter adopted the findings of the first and responded to the new information that Plaintiff had submitted, noting that the medical-opinion forms and vocational assessment did not contain information suggesting that Plaintiff was disabled continuously through the elimination period. (Doc. No. 26-16 at 114–20). Although Defendants did not use the words "objective evidence" in explaining the reasons for denying Plaintiff's claim, the Court does not require a shibboleth at the expense of substance. Defendants clearly denied her claim because she failed to submit evidence showing that her symptoms resulted in a disability as

defined by the plan throughout the elimination period and because evidence in the record cut against her claim. Plaintiff's contention that Defendants are raising an impermissible post-hoc argument accordingly falls short. And, for the reasons explained above, Defendants' decision to deny Plaintiff's claim was a rational one supported by substantial evidence.

### C. Plaintiff's activity levels

Plaintiff next argues that Defendants' reliance on evidence of Plaintiff's activity level during the elimination period rendered their denial arbitrary and capricious. (Doc. No. 56 at 13–14). She suggests that the medical records instead demonstrate a developing inability on her part to maintain the same active lifestyle that she previously had. (*Id.*). Defendants assert that evidence of Plaintiff's activity level during the elimination period was just one type of evidence that influenced their denial of her claim. (D.E. 55 at 12–14). And they note that the evidence demonstrates an inconsistency between Plaintiff's self-reported symptoms of overwhelming fatigue and her ability to remain at least somewhat active. (*Id.*).

Defendants are correct to point out that the essential inquiry is not whether the administrator's *reliance on discrete pieces of evidence* was arbitrary and capricious, but whether the overall "decision denying benefits" was. *Brown v. Fed. Exp. Corp.*, 610 F. App'x 498, 506 (6th Cir. 2015) (quoting *McClain*, 740 F.3d at 1066). And as noted above, Defendants adopted a holistic approach to reviewing Plaintiff's claim. The initial denial letter cites Plaintiff's active lifestyle as one reason supporting their conclusion. (Doc. No. 26-4 at 66). Plaintiff's normal test results and self-reported improvement in symptoms during the elimination period, among other pieces of evidence, are also noted as reasons for denying her claim. (*Id.* at 66–67). Although Hansen reported that Plaintiff was unable to exercise or stay active during the elimination period, (Doc. No. 26-10 at 217), "the Supreme Court [has] made clear that in ERISA cases, 'courts have

no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.'" *Holden*, 2021 WL 2836624, at \*11 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). Hansen made her findings in January 2021, and Plaintiff reported to her cardiologist in February 2021 that she cycled six to eight miles, used a treadmill, and did "a lot" of strength training. (Doc. No. 26-3 at 177). Defendants cited this inconsistency within the records and concluded that Plaintiff's self-reported activity level during the elimination period was inconsistent with an inability to work as a nurse practitioner. (Doc. No. 26-4 at 66).

Because the arbitrary-and-capricious standard requires that the Court consider the ultimate decision of the administrator, not simply discrete choices, and because information regarding Plaintiff's activity level was inconsistent within her own medical records, Defendants did not act unreasonably in citing the information in their denial of Plaintiff's claim for benefits.

### D. Consideration of all relevant evidence

Plaintiff's final substantive objection is that Defendants did not engage in reasoned decision-making by failing to consider all relevant evidence. (Doc. No. 56 at 14–17; Doc. No. 58 at 4; Doc. No. 65 at 41–42). Defendants respond by making two primary observations. First, they assert that their decision was guided by an examination of over 3,000 pages of medical records, documents, and other information, involving months of review by medical professionals. (Doc. No. 48 at 19–21; Doc. No. 55 at 10–12). This process, Defendants argue, resulted in well-reasoned denial based on the evidence. Second, Defendants aver that much of the evidence that Plaintiff submitted concerns events outside of the elimination period and was therefore irrelevant to determining whether Plaintiff was continuously disabled throughout that period. Defendants have the better arguments.

Plaintiff asserts that Defendants failed to consider Hansen's January 2022 letter and the letters submitted by her current partner and ex-wife. (Doc. No. 56 at 14–17; Doc. No. 58 at 6).[7] Hansen's letter simply reiterated her conclusions revealed in medical records that Plaintiff had previously submitted and disputed Dr. Bartlett's findings. (Doc. No. 26-15 at 70–71). The letter did not, as Defendants correctly point out, provide any new objective evidence to support finding that Plaintiff was disabled throughout the elimination period. Likewise, although the letters from Plaintiff's romantic partners allege that Plaintiff suffers from excruciating malaise and fatigue, they provide no new medical evidence to support a finding that Plaintiff was unable to work as a nurse practitioner during the elimination period. (Doc. No. 26-13 at 155–59). Importantly, other than a brief reference to Plaintiff's difficulty visiting a zoo in October 2020, none of letters address whether Plaintiff was continuously disabled throughout the elimination period.

"ERISA was enacted to promote the interests of employees and their beneficiaries, and to protect contractually defined benefits." *Firestone Tire & Rubber Co.*, 489 U.S. at 113 (internal quotation marks and citations omitted). In the present case, the Plan defined disability and required that a claimant meet that definition continuously throughout the elimination period to receive benefits. Evidence that Plaintiff submitted needed to prove this contractual definition. Because the letters "lack any particularity about [Plaintiff's] ability during the relevant period," they did not allow Defendants, and do not allow the Court on review, to "reach a finding a disability." *Tranbarger v. Lincoln Life & Annuity Co. of N.Y.*, 68 F.4th 311, 315 (6th Cir. 2023). Indeed, only evidence that "speaks to Plaintiff's condition during the relevant time period" is germane. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt.*, 741 F.3d 686, 690 n.1 (6th Cir. 2014).

---

[7] Plaintiff's argument regarding Hansen's letter is raised in her amended memorandum (Doc. No. 65 at 41–42) and is repeated verbatim in her response to Defendants' memorandum (Doc. No. 56 at 16–17). The Court will cite only to her response.

Furthermore, as discussed above, the Supreme Court has made clear that plan administrators are not required to "accord special deference to the opinions of treating physicians," like Hansen. *Black & Decker Disability Plan*, 538 U.S. at 831. For these reasons, Defendants' failure to consider the three letters does not render their decision to deny Plaintiff's claim for benefits arbitrary or capricious.[8]

## II.  Conflict of interest

Plaintiff devotes much of her briefing to a procedural argument regarding Defendants' alleged conflict of interest. (Doc. No. 58 at 6–7; Doc. No. 65 at 23–40). The crux of her argument, which she attempts to support with more than 1,110 pages of exhibits (*see* Doc. Nos. 51-1 to 51-25), is that the denial of her claim was the product of two impermissible conflicts of interest. First, Defendants allegedly conducted a sham investigation of her claim because of a longstanding practice of seeking to deny a target number of claims regardless of their merits. (Doc. No. 58 at 6–7; Doc. No. 65 at 20–40).[9] Second, Plaintiff argues that because bonuses for file-reviewing physicians are partially tied to overall company profitability, the medical opinions of these physicians are inherently tainted. (Doc. 65 at 34–40).

---

[8] The Court notes that Plaintiff cites to *Smith v. Continental Casualty Co.*, 450 F.3d 253, 261 (6th Cir. 2006), and *Oliver v. Coca-Cola Co.*, 497 F.3d 1181, 1199 (11th Cir. 2007), in support of her argument that Defendants neglected to consider all relevant evidence and thus rendered an arbitrary and capricious decision. (Doc. No. 56 at 16). In both of those cases, the court determined that the defendant's reviewing physician's review was flawed due to a failure to consider clearly relevant medical records and evidence. *Oliver*, 497 F.3d at 1199 (failing to consider "two EMG tests and the nerve conduction test"); *Smith*, 450 F.3d at 261 (identifying a failure to provide the reviewing physician with all medical records provided by the claimant). By contrast, Dr. Bartlett and Defendants explained that they had thoroughly reviewed all relevant medical records. Only Hansen's January 2022 letter, which provides no new medical information and does not address the elimination period, was not provided to Dr. Bartlett.

[9] When reviewing claim denials in ERISA cases, district courts are typically constrained to consider the existing administrative record. *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006). "The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as . . . alleged bias on its part." *Id.* Although Plaintiff does not point out this fact, the Court will consider the exhibits outside of the administrative record to resolve Plaintiff's procedural challenge.

"The Supreme Court has recognized that an inherent conflict of interest exists when a defendant plays the dual role of both deciding a plan participant's eligibility for benefits and paying out those benefits from its own coffers." *Autran*, 27 F.4th at 418 (citing *Glenn*, 554 U.S. at 108). When a plan administrator works under such a conflict, "that conflict must be weighed as a 'factor in determining whether'" the denial was arbitrary or capricious. *Glenn*, 554 U.S. at 108 (citing *Firestone Tire & Rubber Co.*, 489 U.S. at 115). "[T]he significance of the factor will depend upon the circumstances of the particular case." *Id.* But the Sixth Circuit has "emphasized that 'conclusory allegations of bias' based on this (relatively common) inherent conflict do not deserve much weight." *Autran*, 27 F.4th at 418 (quoting *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 664 (6th Cir. 2013)). Indeed, "an alleged conflict matters only if there is also 'evidence suggesting that the conflict materialized in a concrete way to influence the administrator's decisional process.'" *Harmon v. Unum Life Ins. Co. of Am.*, No. 23-5619, 2024 WL 1075068, at *4 (6th Cir. Mar. 12, 2024) (quoting *Autran*, 27 F.4th at 418). And, critically, "that evidence must be 'significant,' showing 'that the conflict actually affected or motivated the *decision at issue*.'" *Holden*, 2021 WL 2836624, at *17 n.21 (quoting *Cooper*, 486 F.3d at 165).

A. *Claims denial process*

Plaintiff purports that Defendants have maintained a decades-long scheme involving setting a claims-denial goal and tracking and disseminating these goals in weekly reports. (Doc. No. 65 at 25–33). She points to emails, excerpts from depositions, sworn testimony, and other evidence, gathered since 2007, as proof that Defendants have maintained a longstanding and nefarious plan to deny meritorious claims. The only evidence that this alleged conflict infected the denial of Plaintiff's claim, however, comes from the deposition testimony of John Waters, a long-term disability director employed by Defendants who oversaw the team that handled Plaintiff's

claim. (Doc. No. 51-14). That team included a disability benefits specialist ("DBS") and an appeals specialist ("AS"). (Doc. No. 55-2 at 6). The DBS and AS, assisted by a team of medical professionals reviewing information submitted by Plaintiff, managed the claims process and, ultimately, decided to deny Plaintiff's claim. (*Id.*). Waters simply managed the DBS and AS and did not make the decision to deny Plaintiff's claim. (*Id.*)

However, as a director, Waters had access to weekly tracking reports that tracked information such as when an insured filed a claim or when a claim was closed (whether the claim was denied, the insured died, or the insured voluntarily terminated the claim), liability acceptance rates, social security offsets, and other metrics. (Doc. No. 55-2 at 10). Plaintiff alleges that these weekly reports also contained a number of "recoveries" that masqueraded as benign statistics, but in fact were denial goals. (Doc. No. 65 at 25). Defendants note that "recovery" is the term used to describe when a claim closes for any reason other than the claimant dying or aging out of policy coverage. (Doc. No. 55 at 4 n.1). According to deposition testimony, the recovery metrics contained in the weekly reports are generated by Defendants' finance department to reflect, in any given period, how many claims closed actually closed and, using historical data, how many claims are likely to close. (Doc. No. 55-2 at 3–4). This information was shared with directors but not with the DBS or AS. (*Id.* at 10–11). In reply, Plaintiff argues that the access of Waters—who did not make claims decisions—to the weekly tracking report demonstrates that the alleged conflict of interest tainted the investigation into Plaintiff's claim. (Doc. No. 58 at 6–7).

A quartet of recent cases from the Eastern District of Tennessee is particularly helpful here. *See, e.g.*, *Olah v. Unum Life Ins. Co.*, No. 1:19-CV-96-KAC-CHS, 2023 WL 7305033, at *8–9 (E.D. Tenn. Nov. 6, 2023), *appeal dismissed*, No. 23-6067, 2024 WL 2852092 (6th Cir. Mar. 20, 2024); *Harmon v. Unum Life Ins. Co. of Am.*, No. 1:20-CV-318-KAC-CHS, 2023 WL 4166085,

at \*16 (E.D. Tenn. June 23, 2023), *aff'd*, No. 23-5619, 2024 WL 1075068 (6th Cir. Mar. 12, 2024);

*Frost v. Unum Life Ins. Co. of Am.*, No. 1:21-CV-269, 2023 WL 2261415, at \*16–18 (E.D. Tenn.

Feb. 14, 2023); *Sandeen v. Paul Revere Life Ins. Co.*, No. 1:18-CV-248, 2022 WL 966848, at \*13–

15 (E.D. Tenn. Mar. 30, 2022), *aff'd sub nom. Sandeen v. Unum Grp. Corp.*, No. 22-5374, 2023

WL 2379012 (6th Cir. Mar. 7, 2023). In each of those cases, Plaintiff's counsel served as the

claimant's counsel and raised conflict-of-interest arguments nearly identical to the one here. And

in each of those cases, that argument fell short for the same reason: the plaintiff failed to identify

any evidence that the weekly tracking reports *actually* influenced the decision to deny their claim.

*See Olah*, 2023 WL 7305033, at \*9; *Harmon*, 2023 WL 4166085, at \*17; *Frost*, 2023 WL

2261415, at \*17; *Sandeen*, 2022 966848, at \*14–15. The same is true in the present case. Plaintiff

has produced hundreds of pages of evidence. But none of it serves to make any connection, beyond

conclusory and tenuous allegations, between Waters's role as a director, his access to the weekly

tracking reports, and the ultimate decision to deny Plaintiff's claim. Plaintiff accordingly has failed

to "provide 'significant evidence' that the conflict actually affected" Defendants' denial of her

claim. *Cooper*, 486 F.3d at 165 (quoting *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir.

1998)).[10]

---

[10] The Supreme Court has made clear also that a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117. Defendants undertook extensive efforts to conduct a rigorous investigation of Plaintiff's claim. As discussed above, multiple employees and medical professionals analyzed the merits of the claim by independently combing through thousands of pages of records. Such a "thorough review of the record" couple with the absence of evidence that "the review was improperly influenced" by the conflict, is enough to conclude that the conflict of interest did not result in an arbitrary or capricious denial. *Scwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 312 (6th Cir. 2010); *see also supra* note 6 (addressing the application of the "arbitrary and capricious" standard).

### B. *Bonuses for file-reviewing physicians*

Plaintiff's final argument regarding Defendants' alleged conflict of interest is that the bonuses that file-reviewing physicians received themselves evince bias. For support, she points to claims investigation files from 2009 and 2010 and deposition testimony of Dr. Freeman Broadwell, a file-reviewing physician, as well as deposition testimony from Dr. Bartlett. (Doc. Nos. 51-17 to 51-19, 51-25). According to Plaintiff, Defendants pay file-reviewing physicians bonuses when the company reaches an internally set level of profitability. (Doc. No. 65 at 35). Because denial of claims results in higher profits for Defendants, the physicians are financially incentivized to deny claims. (*Id.* at 35–36). Dr. Bartlett testified that file-reviewing physicians received bonuses that were at least partially tied to employee performance and company profitability. (Doc No. 51-25 at 3–4). His testimony does not, however, reveal a sinister scheme to incentivize file-reviewing physicians to deny as many claims as possible. This second theory of conflict of interest suffers from the same infirmity as did the first.

Dr. Broadwell did not work on the investigation of Plaintiff's claim, and Plaintiff otherwise provides no evidence showing that the alleged bonus scheme "actually affected" the denial of her claim. *Cooper*, 486 F.3d at 165. Instead, as before, she relies solely on speculative allegations of a plot to deny claims for financial gain. *See Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 605 (6th Cir. 2012) (declining to find bias where the plaintiff "offer[ed] no more than cursory statements" in support of his allegations). As a result, Plaintiff has failed to show that Defendants' conflict of interest resulted in an arbitrary or capricious denial of her claim for benefits.

Indeed, having reviewed thousands of pages of records, the Court concludes that Defendants' decision to deny Plaintiff's claim was neither substantively nor procedurally flawed. Instead, it was the product of "a deliberate, principled reasoning process and . . . supported by

substantial evidence." *Autran*, 27 F.4th at 411 (quoting *Davis*, 980 F.3d at 547) (omission in original). And under applicable law, this means that the decision—even if it is ultimately debatable on the merits—survives Plaintiff's challenge to it.

## CONCLUSION

For the foregoing reasons, the Court finds Defendants decision to deny Plaintiff's claim for long-term disability benefits was neither arbitrary nor capricious. Accordingly, Defendants' motion for judgment on the administrative record (Doc. No. 47) is GRANTED, and Plaintiff's motion for judgment on the administrative record (Doc. No. 50) is DENIED. As a result, the case is DISMISSED.

The Clerk shall enter judgment under Federal Rule of Civil Procedure 58 and close the file.

IT IS SO ORDERED.


_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE